**FILED**
**SEPTEMBER 13, 2016**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| KIM MIKKELSEN, | ) | |
| | ) | No. 33528-3-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PUBLIC UTILITY DISTRICT #1 OF | ) | OPINION PUBLISHED IN PART |
| KITTITAS COUNTY, JOHN HANSON, | ) | |
| PAUL ROGERS, and CHARLES WARD, | ) | |
| | ) | |
| Respondents. | ) | |

SIDDOWAY, J. — Kim Mikkelsen appeals the summary judgment dismissal of her wrongful discharge and discriminatory discharge claims against the Kittitas County Public Utility District (PUD), its commissioners, and its former general manager, Charles Ward. Ms. Mikkelsen worked satisfactorily for 27 years, mostly part time, as the PUD's finance manager and as an interim general manager. But she does not dispute that within the first year of Mr. Ward's tenure as general manager, she and he "just plain didn't get along." Clerk's Papers (CP) at 380.

She persuades us that Washington should follow the majority of federal circuit courts and apply the *McDonnell Douglas*[1] burden-shifting approach to discrimination claims without requiring a discharged plaintiff to demonstrate, as part of her prima facie case, that her replacement came from outside her protected class. But it does not avail her, because she fails to meet her burden at the third step of the *McDonnell Douglas* analysis.

We address and affirm dismissal of her discrimination claims in the published portion of this opinion.

In the unpublished portion, we address the dismissal of Ms. Mikkelsen's breach of policy, negligent hiring and supervision, and intentional infliction of emotional distress claims. Here again, a reasonable trier of fact could reach only one conclusion: her evidence is insufficient. We affirm the summary judgment dismissal of all of Ms. Mikkelsen's claims.

## FACTS AND PROCEDURAL BACKGROUND

Because we are reviewing the dismissal of claims on summary judgment, we view disputed evidence in the light most favorable to Ms. Mikkelsen as the nonmoving party.

The Kittitas County PUD, which provides electrical service to Kittitas County and a small section of Yakima County, has approximately 15 employees. It is administered

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

2

by a three-member board of commissioners. Day-to-day operations are the responsibility of its general manager.

Kim Mikkelsen was a part-time manager of accounting and finance for the PUD for 27 years. The part-time nature of the position enabled her to operate a private consulting business providing services to other utilities on financial, administrative, and accounting matters. According to her, she would usually be at the PUD two or three days a week, although there were some times when she would be gone for a full week and would make up the work the next week. She was compensated on an hourly basis.

In August 2009, after then-general manager Mark Kjelland resigned, Ms. Mikkelsen was appointed as the PUD's interim general manager. Mr. Kjelland's resignation followed a whistleblower complaint against him that was filed by four employees, one being Ms. Mikkelsen. Although the board encouraged Ms. Mikkelsen to apply for the permanent general manager position, she declined.

During her roughly 10 months as interim general manager, Ms. Mikkelsen helped organize the nationwide search for Mr. Kjelland's replacement. She researched potential executive search firms and recommended three to the board. The commissioners decided to engage Langley & Associates. The firm vetted between 50 and 60 applicants for the general manager position, performing credential verification, reference, and background checks. It identified nearly 30 qualified candidates; from those, the board selected seven to personally interview, one being Mr. Ward. Mr. Ward had 29 years of experience in the

3

power industry and had previously been the manager of engineering and operations for High Plains Power in Riverton, Wyoming. High Plains gave Mr. Ward a favorable recommendation.

According to Ms. Mikkelsen, she expressed concern to the board before Mr. Ward was offered the general manager position about how many of his prior positions had been short-term, including one from which he admitted being fired. The board nonetheless selected Mr. Ward for the general manager position. It addressed the concern that he changed jobs too frequently by offering him a bonus should he stay with the PUD for at least five years.

Also during her time as interim general manager, Ms. Mikkelsen investigated other utilities' progressive discipline policies and developed a proposed "corrective action" policy for the PUD. Her proposal was the subject of meetings and discussion by the board, which adopted a corrective action policy in November 2009. At the time Mr. Ward assumed the position of general manager, Ms. Mikkelsen had applied the policy once, giving a verbal warning to a union lineman. Mr. Ward also applied the policy once during his tenure, again giving a verbal warning to a union lineman.

Mr. Ward assumed the positon of general manager on May 14, 2010, and Ms. Mikkelsen returned to her position as finance manager. Initially Mr. Ward and Ms. Mikkelsen worked together without problems. Harmonious relations did not last long, however.

4

In deposition testimony of Ms. Mikkelsen offered in connection with summary judgment motions in the trial court, she described the deterioration in their relationship:

Q.     . . . You start out and you and Mr. Ward are working positively together. And so what happened from your perspective to the working relationship?

A.     Chuck's management style is such that he has to have someone—he calls it accountability. I call it blame. Because he doesn't want anything to come back on him. So he has to have somewhere to structure his blame.
And it's an unfortunate thing. And it obviously isn't working. But I was just the recipient of—and I think it's a pattern that will haunt him until he changes his behavior.

CP at 110. Elsewhere, Ms. Mikkelsen described Mr. Ward's management style as "flash management," by which she meant he would execute decisions first and think about them later. CP at 113. She also described his style as "termination and insubordination," adding, "There was a lot of 'ations in his speech patterns." CP at 109. She described herself, by contrast, as a "tell it like it is person," and her own management style as "team leader." CP at 131, 125.

Mr. Ward initially made Ms. Mikkelsen the acting manager in his absence but changed that around January 2011, rotating the assignment thereafter between Matt Boast and Brian Vosburgh, the two other members of the PUD's small management team. According to Ms. Mikkelsen, "[T]hat didn't bother me. I didn't particularly want the position." CP at 132.

5

By late March 2011, however, Ms. Mikkelsen had grievances she wanted to discuss with Mr. Ward. She requested a meeting. According to Ms. Mikkelsen, the subject of the March meeting was what she viewed as a "general communication breakdown." CP at 114.

> Q. So a general communication breakdown between you and Mr. Ward?
> A. That's correct.
> Q. Did you think that was a mutual breakdown or was it his fault and you were just fine?
> A. No, every communication breakdown is mutual.
> Q. And what about the communication process between you and Mr. Ward did you think needed work by both of you?
> A. I would have liked Chuck to not call me untrustworthy, especially in front of my contemporaries. I would have liked for Chuck to not speak over me and disregard anything I had said. I would have liked for Chuck to study things prior to making decisions that would impact me.

*Id.*

Ms. Mikkelsen prepared an outline of issues she wished to cover that she took into her meeting with Mr. Ward on March 30. She made him a copy at his request. Two pages and a portion of a third chronicle at least 10 complaints, including that Mr. Ward's behavior and communication with her were disrespectful; he engaged in passive/aggressive behavior; he made decisions without knowing the facts; he assigned duties without considering staff capacity; he reacted belligerently when she suggested his approach to union negotiations would not be bargaining in good faith and was exposing the PUD to liability; he unfairly accused her of being untrustworthy and taking "jabs;"

6

and he rejected her proposal for how to correct employee pay differential errors by prior management. CP at 333-34. Her memo concluded, "What do you propose to correct this behavior?" CP at 335. Her only reference to gender or discrimination in the premeeting memo was in connection with the reference to disrespectful behavior and communication "toward me, the only woman in a senior management position for the [PUD]." CP at 333.

Ms. Mikkelsen's notes made after the meeting indicate Mr. Ward denied treating her any differently than other staff members. He said he trusted her and "would have to start acting differently around [her]." CP at 335. But she noted her disbelief that he "took ownership of any gender bias or going around [her] to avoid ideas that may not be in agreement with his." *Id.*

By June 2011, Ms. Mikkelsen was concerned enough about her and Mr. Ward's poor relationship that she paid the PUD for a cell phone it had issued to her the prior year, which she had sometimes used in connection with consulting engagements. She transferred the phone service contract to her name and planned to return the PUD's computer and printer she had at her home. According to her notes, she was concerned that Mr. Ward would "use [the phone] as a weapon against [her] in some manner," or accuse her of accepting a "gift of public funds." CP at 336. She testified when deposed:

> A. My relationship with Chuck had disintegrated substantially . . . .
> It was paranoia on my part.
> Q. So by that point, you didn't trust Chuck; is that true?

7

A.    That's correct.

CP at 123. Her notes indicate, "I . . . am losing sleep worrying about my continued employment." CP at 336.

PUD Commissioner John Hanson called Ms. Mikkelsen on July 24, 2011, and asked her how things were going at the PUD, telling her he "could tell from the demeanor in the board room that something was wrong." CP at 83. According to Ms. Mikkelsen, she told Commissioner Hanson that "all communication had pretty much ceased between Chuck and I." CP at 85. She told the commissioner that Mr. Ward had been deprecating to her in staff meetings and spoke over her if she offered an opinion. She told him that although she met with Mr. Ward to attempt to get him to discuss things, he discounted their conversations. She told Commissioner Hanson she was afraid Mr. Ward had a general bias against her as his senior female staff member.

When Commissioner Hanson asked what she would suggest the board do about the situation, she suggested administering an employee survey, to be answered anonymously, to see if other employees shared her concerns. Two weeks later, Commissioner Hanson asked her to forward such a survey, which she did; he then asked her to forward it to the other commissioners along with a suggestion of a special board meeting. On Monday, August 8, she e-mailed the proposed survey to the commissioners with the message, "John has asked me to forward this survey for your review and a possible Special Board Meeting Thursday or Friday of this week." CP at 248. At the

8

time, Mr. Ward was out of town for his daughter's wedding and was not expected back until the following week.

Ms. Mikkelsen did not provide Mr. Ward with a copy of her e-mail or her proposed survey, even after Commissioner Roger Sparks responded to her e-mail, on the 8th, "Is this something Chuck is considering? Are the survey and the special board meeting related? If so, I think we should wait until Chuck returns from vacation." CP at 248.

Ms. Mikkelsen's proposed survey contained 8 sections on different aspects of an employee's work, pay and benefits. Six contained no more than 10 questions; some contained as few as 5 or 6. Two sections dwarfed the others: the sections on "Supervisor's Behavior," which contained 18 questions, and the section on the general manager, which contained 29. Among the questions about the general manager were, "Conflicts are caused in my organization by our not seeing common interests," "The General Manager is biased on the basis of gender," "The General Manager handles authority effectively, not abusively," and "The General Manager keeps informed on his/her employees' feelings." CP at 249-67.

When deposed, Ms. Mikkelsen admitted Mr. Ward could perceive her suggestion of this anonymous survey as going around his back:

Q. Weren't you concerned about . . . sending this to the commissioners without [having] advis[ed your] general manager . . . ?
. . . .

9

A. Very concerned.
Q. You would imagine that he would think you're going behind his back, wouldn't you?
A. Which is why I suggested—
Q. Answer the question. Wouldn't you think that?
A. With Chuck, the way Chuck thought, yes.

CP at 96. Asked whether, at this point, "[Y]ou and Mr. Ward just plain didn't get along, isn't that true?" she answered, "That would be a true statement." CP at 380.

On Mr. Ward's return from vacation, he learned of Ms. Mikkelsen's e-mail and her proposed survey from Commissioner Sparks. He *did* view it as going behind his back. He also viewed it as the "last straw," explaining, "She's undermining my authority. She's obviously out to get me and make the PUD look bad." CP at 152. Aware of Ms. Mikkelsen's involvement in forcing Mr. Kjelland to resign, he felt the purpose of her proposed survey was to have him removed as general manager. After consulting with the three commissioners, he acted on his decision to terminate Ms. Mikkelsen's employment.

On August 22, 2011, Mr. Ward called Ms. Mikkelsen in for a meeting. Reading from a script, he told her, "[I]t's not working out," and that her employment was terminated. CP at 319. When she asked what "it" was, he refused to elaborate, sticking to his script. Ms. Mikkelsen asked for a copy of her personnel file before leaving the workplace. It contained no record of warnings or discipline. In responding to the Employment Security Department's inquiry after Ms. Mikkelsen applied for unemployment benefits, the PUD responded that she "was an 'at will' employee . . .

10

terminated without cause." CP at 402. Ms. Mikkelsen was 57 years old at the time she was fired.

After Ms. Mikkelsen's termination, Genine Pratt, a certified public accountant, was hired on a contract basis to perform Ms. Mikkelsen's former responsibilities. She was offered and accepted Ms. Mikkelsen's former position after eight months. Ms. Pratt was 51 years old at the time of hire.

Ms. Mikkelsen filed suit against the PUD, its commissioners, and Mr. Ward on November 8, 2011.

The PUD terminated Mr. Ward's employment on December 31, 2011.

Ms. Mikkelsen ultimately alleged she was discharged in violation of the corrective action policy and that sex and age discrimination were substantial factors in her termination. She also alleged that the PUD negligently hired and supervised Mr. Ward, and that the defendants had intentionally inflicted emotional distress on her.

Asked in discovery about evidence of discrimination, she cited her belief that Mr. Ward treated her differently than he treated the two male members of the PUD's management team. She also cited the facts that Mr. Ward (1) stated once in a union meeting that "if the board would buy him uniforms, he'd be happy to wear them just so long as they weren't pink;" (2) referred to the outside crew as "the crew" but referred to the office staff (all women) as "the ladies or the girls;" (3) would, upon entering her

11

office, "reach into his pockets and rearrange his genitals" before taking a seat; and finally (4) stated on the day he fired her, "Now, don't you make a scene." CP at 86-88.

As evidence of age discrimination, Ms. Mikkelsen stated Mr. Ward had described a long-term employee as "old and stale" and that he had a fixation on the age of a 72-year-old staff member. CP at 90.

Ms. Mikkelsen acknowledges that at no time before filing suit did she notify Mr. Ward or the PUD commissioners that she was offended by Mr. Ward's references to "ladies," "old and stale" employees or his stated unwillingness to wear a pink uniform. She never said anything to Mr. Ward about her objections to his practice of putting his hands in his pockets when he sat down in her office.

Following the conduct of discovery, all defendants moved for summary judgment as to all claims. The trial court granted their motions and dismissed the complaint. Ms. Mikkelsen appeals.

## ANALYSIS

Ms. Mikkelsen appeals dismissal of each of her four claims.

When reviewing a grant of summary judgment, we engage in the same inquiry as the trial court. *Marincovich v. Tarabochia*, 114 Wn.2d 271, 274, 787 P.2d 562 (1990). Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). "The court must consider the facts in the light most favorable to the nonmoving party, and the

12

motion should be granted only if, from all the evidence, reasonable persons could reach but one conclusion." *Marincovich*, 114 Wn.2d at 274. We may affirm summary judgment dismissal of a claim on any basis supported by the record. *LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989).

We first address dismissal of Ms. Mikkelsen's discrimination claims and then turn to the others in the order presented in Ms. Mikkelsen's amended complaint.[2]

## *I. Discriminatory discharge*

Ms. Mikkelsen claims that in discharging her, Mr. Ward discriminated based on her sex and age. Under the Washington Law Against Discrimination (WLAD), ch. 49.60 RCW, "[i]t is an unfair practice for any employer . . . [t]o discharge . . . any person from employment because of age, [or] sex." RCW 49.60.180(2).

Ms. Mikkelsen admits to having no direct evidence that Mr. Ward intentionally discriminated against her on the basis of sex or age, but she argues that she presented evidence sufficient to survive summary judgment under the indirect, burden-shifting framework articulated by the United States Supreme Court in *McDonnell Douglas* and adopted by Washington courts in, *e.g.*, *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 362, 753 P.2d 517 (1988).

---

[2] Mr. Ward claims individual immunity from certain of Ms. Mikkelsen's claims under RCW 54.12.110, and that he cannot be liable for the asserted breach of a PUD contract. Because we affirm the dismissal of all claims on the merits we need not reach his additional, individual defenses.

13

Under the three-step *McDonnell Douglas* analysis, a plaintiff bears the initial burden of establishing a prima facie case of discrimination, thereby creating a presumption of discrimination. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 446, 334 P.3d 541 (2014). If the plaintiff presents a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Scrivener*, 181 Wn.2d at 446. If the defendant meets this burden, the plaintiff must produce evidence sufficient to create a genuine issue of material fact either (1) that the employer's reason is pretextual or (2) that although the stated reason is legitimate, "discrimination nevertheless was a substantial factor motivating the employer." *Id.* at 446-47. "If the plaintiff satisfies the *McDonnell Douglas* burden of production requirements, the case proceeds to trial, unless the judge determines that no rational fact finder could conclude that the action was discriminatory." *Id.* at 446.

The trial court dismissed Ms. Mikkelsen's discrimination claims relying on Washington cases stating that a prima facie case of discriminatory discharge is established by showing that the employee (1) was within a statutorily protected group; (2) was discharged by the defendant; (3) was doing satisfactory work; and (4) was replaced by someone outside the protected group—or, in the case of age discrimination, by someone "significantly younger." *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 188, 23 P.3d 440 (2001) (age discrimination); *Domingo v. Boeing Empls. Credit Union*, 124 Wn. App. 71, 80, 98 P.3d 1222 (2004) (sex discrimination). It is undisputed that Ms.

14

Mikkelsen was replaced by a woman only six years younger than she was when discharged.

Ms. Mikkelsen admits she cannot prove replacement by someone outside her protected class but argues that *McDonnell Douglas* and other decisions of the United States Supreme Court do not support that fourth, replacement element. After reviewing federal cases, we are persuaded that she is correct. We believe our own Supreme Court, which adopted the replacement element before it was critically examined by federal courts, would agree.

*McDonnell Douglas* was a failure-to-hire case, not a case complaining of a discriminatory discharge. It described a complainant's initial burden of establishing a prima facie case of racial discrimination as

> showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, *after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.*

411 U.S. at 802 (emphasis added). It added, by footnote, "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *Id.* at n.13.

In *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), the Supreme Court elaborated on the plaintiff's

15

ultimate and intermediate burdens, observing that the ultimate burden of proving intentional discrimination "remains at all times with the plaintiff." It described the intermediate evidentiary burdens as bringing the litigants and the court "expeditiously and fairly to this ultimate question." *Id.*

Importantly, it observed that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous," yet it serves an "important function" of "eliminat[ing] the most common nondiscriminatory reasons for the plaintiff's rejection." *Id.* at 253-54. As articulated in *McDonnell Douglas*, 411 U.S. at 802, the second element of the prima facie case—that the plaintiff "applied and was qualified for a job for which the employer was seeking applicants"—eliminates cases where the employer has no employment vacancy and cases where an applicant lacks the qualifications sought in an employee. The fourth element—"that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications" —eliminates cases where the employer changes its mind either about the qualifications sought (ruling out the plaintiff as a candidate) or about whether to fill a vacancy at all. The prima facie case as articulated in *McDonnell Douglas* does not require the complainant in a failure-to-hire case to show that the person hired to replace him was from outside his protected class.

As federal courts translated the elements of a prima facie failure-to-hire case from *McDonnell Douglas* to a discriminatory discharge case, at least some translated its fourth

16

element as proof that the plaintiff was replaced with someone outside the protected class. We have not attempted to trace that federal history, but can trace Washington's adoption of the replacement element to *Roberts v. Atlantic Richfield Co.*, 88 Wn.2d 887, 568 P.2d 764 (1977), in which age discrimination under the WLAD was alleged. Noting that "[w]e have not had occasion to delineate the evidence necessary to establish a prima facie case," the court relied on a Fifth Circuit case to hold that a prima facie case of age discrimination is established by showing that a plaintiff "'was within a protected class, was asked to take early retirement against his will, was doing apparently satisfactory work, and was replaced by a younger person . . . .'" *Id.* at 892 (quoting *Wilson v. Sealtest Foods Div. of Kraftco Corp.*, 501 F.2d 84, 86 (5th Cir. 1974)).

Nine years later, relying on *Roberts*, our Supreme Court affirmed dismissal of a plaintiff's age discrimination case because he failed to establish as part of his prima facie case that he was replaced by someone outside the age group protected by the WLAD. *Brady v. Daily World*, 105 Wn.2d 770, 777, 718 P.2d 785 (1986). The employee in *Brady* did not challenge the replacement element.

Two years thereafter, in *Grimwood*, our Supreme Court cast mild doubt on the replacement element when it pointed to the First Circuit Court of Appeals' disagreement with replacement as an element of a prima facie case, stating "In *Loeb* [*v. Textron, Inc.*, 600 F.2d 1003 (1st Cir. 1979)], the court . . . points out that the element of replacement by a younger person or a person outside the protected age group *is not absolute*; rather,

17

the proof required is that the employer 'sought a replacement with qualifications similar to his own, thus demonstrating a continued need for the same services and skills.'" 110 Wn.2d at 363 (emphasis added) (quoting *Loeb*, 600 F.2d at 1013). By saying the replacement element "is not absolute" rather than that it is not an element, the Supreme Court invited its continued application.[3]

Following *Roberts*, *Brady*, and *Grimwood*, Washington courts have for the most part included the replacement element in applying the *McDonnell Douglas* framework to discriminatory discharge cases. No Washington case has examined its growing rejection by federal courts.

The United States Supreme Court has not squarely addressed whether replacement by an employee outside the protected class is an appropriate element of a prima facie case in applying the *McDonnell Douglas* framework, but two of its decisions are cited as suggesting the high court's disapproval of the element. *St. Mary's Honor Center v.*

---

[3] The language "is not absolute" may understate *Loeb*'s rejection of the replacement element. What *Loeb* says is that "[t]he prima facie case described in *McDonnell Douglas* did not include proof that some person outside the protected class was hired in complainant's place." 600 F.2d at 1013. Elsewhere it states:

> A correct statement of the elements of a *McDonnell Douglas* prima facie case, adapted to present circumstances, therefore would have been that Loeb had to prove that he was in the protected age group, that he was performing his job at a level that met his employer's legitimate expectations, that he nevertheless was fired, and that [his employer] sought someone to perform the same work after he left.

600 F.2d at 1013-14.

18

*Hicks*, 509 U.S. 502, 506-08, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) involved the outcome of a bench trial, and among the district court's findings recounted by the Court (although not relevant to the issue on appeal) was its finding that the plaintiff, a black man, established a prima facie case of discriminatory discharge by demonstrating among other elements that he was replaced by a man who was white. The four-member dissent took pains to point out in a footnote:

> The majority, following the courts below, mentions that Hicks's position was filled by a white male. *Ante*, at 506 (citing the District Court's opinion); see 970 F.2d 487, 491, n. 7 (CA8 1992). This Court has not directly addressed the question whether the personal characteristics of someone chosen to replace a Title VII plaintiff are material, and that issue is not before us today. Cf. *Cumpiano* v. *Banco Santander Puerto Rico*, 902 F. 2d 148, 154-155 (CA1 1990) (identity of replacement is not relevant).

*Id.* at 527 n.1.

Several years later, the Supreme Court held that the fact that a discharged employee suing under the Age Discrimination in Employment Act (29 U.S.C. § 623 (a)(1)) was replaced by someone outside the protected class was not a proper element of the *McDonnell Douglas* prima facie case. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996). The decision may not be as consequential for present purposes as it sounds, because Justice Scalia's opinion for the unanimous court allowed that "the fact that a replacement is *substantially younger* than the plaintiff" would be an indicator of age discrimination, but "the fact that the plaintiff was replaced by someone *outside the protected* [*40 years or older*] *class*" was not. *Id.* at

19

313 (emphasis added). Explaining that "there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a '. . . presumption,'" the opinion stated that an element of "replacement by someone under 40 fails this requirement." *Id.* at 311-12 (quoting *Burdine*, 450 U.S. at 254 n.7).

Some courts, including our Supreme Court in *Hill*, concluded that *O'Connor* merely requires modifying the replacement element of the prima facie age discriminatory discharge case to require a showing of replacement by a "significantly younger" employee rather than by an employee "outside the [over-40 class]." 144 Wn.2d at 188 & n.10. But some federal circuit courts read more into Justice Scalia's statement elsewhere in the opinion that, "The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age*." 517 U.S. at 312. They construe that statement as recognizing that in any discrimination case a plaintiff can be the victim of discrimination and at the same time "lose out" to someone in his or her own protected class. *E.g., Carson v. Bethlehem Steel Co.*, 82 F.3d 157, 158 (7th Cir. 1996); *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 354-55 (3d Cir. 1999).

Given this history, the overwhelming majority of federal circuit courts that have examined the issue have concluded that a discharged employee should not have to demonstrate that she was replaced with someone outside of her protected class as part of

20

the *McDonnell Douglas* prima facie case. Almost all of them did so after our Supreme

Court's decisions in *Roberts* (1977), *Brady* (1986), and *Grimwood* (1988). *See*

*Cumpiano*, 902 F.2d at 154-55 (a First Circuit decision); *Meiri v. Dacon*, 759 F.2d 989,

995-96 (2d Cir. 1985); *Pivirotto*, 191 F.3d 344 (Third Circuit); *Nieto v. L&H Packing

Co.*, 108 F.3d 621 (5th Cir. 1997); *Jackson v. Richards Med. Co.*, 961 F.2d 575, 587 n.12

(6th Cir. 1992); *Carson*, 82 F.3d 157 (Seventh Circuit); *Walker v. St. Anthony's Med.

Ctr.*, 881 F.2d 554, 558 (8th Cir. 1989); *Perry v. Woodward*, 199 F.3d 1126 (10th Cir.

1999); *Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1534 (11th Cir. 1984). *See

also John v. Calderon*, 1996 WL 557658 (N.D. Cal. 1996). Some of the circuit courts

have eliminated the replacement element altogether, some have said that it need not

always be applied, and the position of some appears to lie somewhere in between.[4]

The Tenth Circuit Court of Appeals was the last of the foregoing decisions,

reviewed the others, and elected to eliminate the element altogether. We find its

reasoning persuasive. As it observed, those courts that have not *eliminated* the element—

but also do not *require* it—require a plaintiff to substitute "some additional fact from

which an inference of discrimination can arise" but without "giv[ing] any examples of

---

[4] An annotation seeks to sort out the rationales, although it includes the positions of some of the courts in all three categories. Eric C. Suette, Annotation, *Requirement of Replacement by Nonprotected Individual To Establish Prima Facie Employment Discrimination under 42 U.S.C.A. § 1981, Title VII of the Civil Rights Act (42 U.S.C.A. § 2000e–(a)(1)) and Americans with Disabilities Act (42 U.S.C.A. § 12112(a))*, 172 A.L.R. FED. 465 (2001).

what evidence would be sufficient to give rise to such an inference[,] . . . result[ing] in too much uncertainty for the district courts and the parties." *Perry*, 199 F.3d at 1139. Elsewhere, it explained:

> Supreme Court precedent fully supports [the] conclusion that the termination of a qualified minority employee raises the rebuttable inference of discrimination in every case in which the position is not eliminated. . . . The employer has the opportunity to dispel the inference by articulating a legitimate, non-discriminatory reason for terminating the employee. In meritless cases, the plaintiff will be unable to show that the employer's articulated reason is pretextual, and summary judgment will then be entered for the defendant.

*Id.* at 1140.

Having reviewed Washington decisions applying the WLAD, we find no reason why we should reject the majority federal view that replacement is not an essential element of the prima facie case, and we find a good reason for embracing it. In several cases, Washington courts have excused plaintiffs from demonstrating the fourth element on ad hoc rationales. In *Hatfield v. Columbia Federal Savings Bank*, 57 Wn. App. 876, 790 P.2d 1258 (1990), *overruled on other grounds by Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 864 P.2d 937 (1994), a decision of this court, there were disputed facts over whether the discharged employee was replaced, and if so, by whom. Relying on the statement in *Grimwood* that it did not intend the four elements identified in *Roberts* to be "'rigid, mechanized, or ritualistic,' or the exclusive method of proving a claim," the court excused proof of the replacement element, citing a treatise's suggestion that the element

22

could be dispensed with "'in cases where the plaintiff has introduced direct or

circumstantial evidence of discriminatory intent.'" *Id.* at 882 (quoting *Grimwood*, 110

Wn.2d at 363 and B. SCHLEI & P. GROSSMAN, EMPLOYMENT DISCRIMINATION LAW

498-99 (2d ed. 1983).

In *Callahan v. Walla Walla Housing Authority*, 126 Wn. App. 812, 110 P.3d 782

(2005), this court refused to apply the replacement element in a disability discrimination

case, explaining:

> Replacement by a person outside the protected class is relevant when one
> member of the class is much like another. But disabilities differ widely.
> Replacing a plaintiff who has a burdensome disability with a person less
> inconveniently disabled does not eliminate the possibility that the disability
> was a substantial factor.

*Id.* at 820 & n.1.

Allowing trial courts to require or dispense with the replacement element any time

they believe it to be "rigid, mechanized, or ritualistic" in a given case is no guidance at

all. Like the Tenth Circuit in *Perry*, we believe that the current State of Washington law

results in too much uncertainty for trial courts and parties.

Where a discharged employee *is* replaced by someone within the protected class, it

will not be overlooked in the *McDonnell Douglas* analysis. It is relevant evidence,

helpful to the employer, that will bear on the step three determination of whether a

plaintiff claiming discrimination has established that the employer's proffered reason was

23

pretext or that discrimination was a substantially motivating factor in the employment decision.

Absent a holding on this issue by our Supreme Court, we adopt this refinement of the *McDonnell Douglas* framework by the federal courts for the same reason Washington courts found it helpful to adopt that framework in the first place.

### *Application to this case*

Since we have excused Ms. Mikkelsen from demonstrating the fourth element of the prima facie case, she satisfies the first step of the *McDonnell Douglas* analysis. The burden of production shifts to the PUD to show that it had a legitimate, nondiscriminatory reason for terminating her employment. *Scrivener*, 181 Wn.2d at 446. It states that Ms. Mikkelsen was discharged because "'it just wasn't working out,'" and "[a]fter a complete and mutual communication breakdown, [Mr. Ward and Ms. Mikkelsen] lost trust in one another and it became clear that they could no longer work together." Br. of Resp't PUD at 1. This satisfies the defense burden of articulating a legitimate, nondiscriminatory reason for the firing. *Cf. Briggs v. Nova Services*, 166 Wn.2d 794, 805, 213 P.3d 910 (2009) (corporate board behaved reasonably when it empowered its executive director to terminate the employment of other managers who complained about her performance and were unable to work with her).

With the defense burden of production satisfied, the presumption established by the prima facie case "drops out of the picture." *Hicks*, 509 U.S. at 510-11. The burden

24

shifts back to Ms. Mikkelsen to show that the PUD's reason is pretextual or that discrimination nevertheless was a substantial factor motivating the employer.

Undisputed evidence, including much of Ms. Mikkelsen's own testimony, established that her and Mr. Ward's conflicting management styles led to a "general communication breakdown" that was both logically and temporally related to Mr. Ward's decision to discharge her. Ms. Mikkelsen nonetheless attempts to show pretext by getting into the weeds of the specific conflicts she had with Mr. Ward over the 15 months they worked together and arguing that she, not he, was right—or at least there is a dispute. But it is the defendants who get to articulate the reason for her discharge, not Ms. Mikkelsen, and it relies on the overarching discord and loss of trust in a small management team—the fact that "it just wasn't working out," as she admits being told when she was fired and as she alleged in her amended complaint.[5] She cannot show that the PUD's reason was pretextual because her own testimony supports it.

---

[5] We do not find the defendants to have been inconsistent about the reason for termination, either. Mr. Ward admitted the allegation of ¶ 3.8 of Ms. Mikkelsen's amended complaint that "[t]he reason offered to justify the termination was that '. . . it was just not working out.'" CP at 9. Ms. Mikkelsen now focuses on a memorandum that Mr. Ward prepared to document their history and moves directly to its historical detail, but she skips over the first paragraph, which summarizes his reasons for the termination. The first paragraph of Mr. Ward's memo is entirely consistent with the defendants' position that the termination was because of the management discord. *See* CP at 242 ("Kim's actions and attitude toward me . . . is a disruption to the workplace," "It is getting worse and it will not get any better," "She undermines my authority," "I am unable to trust her anymore," "Without this trust, I am unable to perform my function as the General Manager as I should be able to."). In explaining the termination, it has not

What remains is whether she can show that discrimination nevertheless was a

substantial motivating factor. An employer is entitled to summary judgment at this stage

> "if the plaintiff created only a weak issue of fact as to whether the
> employer's reason was untrue and there was abundant and uncontroverted
> independent evidence that no discrimination occurred." [(quoting *Reeves v.
> Sanderson Plumbing Prods.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L.
> Ed. 2d 105 (2000))]. Whether summary judgment is appropriate in any
> particular case depends on a variety of factors, including "the strength of
> the prima facie case, the probative value of the proof that the employer's
> explanation is false and any other evidence that supports the employer's
> case and that properly may be considered." *Id.*

*Pratt v. City of Houston*, 247 F.3d 601, 606 (5th Cir. 2001);[6] *accord Hill*, 144 Wn.2d at

184-85.

At step three of the *McDonnell Douglas* framework, Ms. Mikkelsen faces the

uncontroverted evidence that the PUD replaced her with a 51-year-old woman,

undercutting any inference that her sex or age were motivating factors in her termination.

She confronts the fact that her own testimony provides strong support for the legitimate,

nondiscriminatory reason offered by the PUD for her discharge. Against this strong

evidence that no discrimination occurred, Ms. Mikkelsen offers only speculation and

---

been inconsistent for Mr. Ward to talk about the history leading up to the management
friction as well.

[6] *Pratt* points out that although *Reeves* was based on a motion for judgment as a
matter of law, the summary judgment standard is the same. *Pratt*, 247 F.3d at 606 n.3.

evidence from which no discriminatory animus can reasonably be inferred.

Ms. Mikkelsen's subjective belief that Mr. Ward terminated her because of her sex cannot be the basis for judicial relief. *Hornsby v. Conoco, Inc.*, 777 F.2d 243, 247 (5th Cir. 1985). Nor can speculation about a defendant's motivation. *Barker v. Advanced Silicon Materials, LLC*, 131 Wn. App. 616, 624, 128 P.3d 633 (2006); *Hines v. Todd Pac. Shipyards Corp.*, 127 Wn. App. 356, 372, 112 P.3d 522 (2005). Even accepting her testimony that Mr. Ward treated her differently from the two male members of the management team, differing treatment could be explained by Mr. Ward's and her conflicting management styles, growing pattern of disagreements, or even because unlike the other members of the team, she was a part-time employee. Lacking any evidence that Mr. Ward treated any other female employees differently from men, or any statement by him denigrating female workers or managers, it is sheer speculation on her part that he treated her differently because she was a woman.[7]

Evidence of references to women as "ladies" or "girls" can be "ambiguous at best and . . . not reveal any hostility or animus toward women." *Creech v. Ohio Cas. Ins. Co.*, 944 F. Supp. 1347, 1358 (S.D. Ohio 1996); *accord Caldwell v. ServiceMaster Corp.*, 966 F. Supp. 33, 50 (D.D.C. 1997) (the words "gal" and "girl" were not reasonably construed

---

[7] Ms. Mikkelsen testified when deposed that Brian Vosburgh once said to her, speaking of Mr. Ward, that "he's got a guy/girl thing with you." CP at 87. She offered no testimony of Mr. Vosburgh in opposing summary judgment. Her inadmissible testimony is useless on the issue.

27

by the plaintiffs as sexually demeaning); *Wilcoxon v. Minn. Mining & Mfg. Co.*, 235 Mich. App. 347, 368, 597 N.W.2d 250 (1999) (fact that manager referred to office workers as "girls," even if they were older than him, could have nothing to do with racial or sexual animus); *Hadeed v. Abraham*, 265 F. Supp. 2d 614, 622 (E.D. Va. 2003), *aff'd*, 103 F. App'x 706 (4th Cir. 2004) (defendants' reference to two female prospective home purchasers as "girls" may be distasteful, but it does not rise to the level of unlawful discrimination). Ms. Mikkelsen does not demonstrate why we should regard Mr. Ward's use of the terms "ladies" or "girls" as being anything more than outdated. She even admitted when deposed, "I don't know that it was inappropriate" to refer to the all-female office staff as "ladies," but "I just thought it would be more appropriate to refer to them in something other than a gender specific role." CP at 87.

We also do not understand why Mr. Ward's stated unwillingness to wear a pink uniform is characterized by Ms. Mikkelsen as a discriminatory remark. We understand that pink remains a color associated with women, reinforced through current breast cancer awareness campaigns, and that the implication is that Mr. Ward didn't want to wear what he viewed as a feminine color—or was at least joking that he didn't. What we don't understand is why that reveals hostility or animus toward women. When asked in deposition what she found inappropriate about the statement, Ms. Mikkelsen answered, unenlighteningly, "Chuck had a problem with women in general." CP at 86.

28

As to Mr. Ward's statement about her not making a scene after being fired, the defense submissions supporting summary judgment include an August 26 file memorandum by Mr. Ward on how Ms. Mikkelsen's termination was handled, in which he admits making the statement and describes how and when it occurred. CP at 398. His memorandum stated in part:

> After the meeting Kim went to her office. The first thing she told Nickie was I have just been fired. I heard Kim say that and asked her to please not make a scene. Kim said she would not.

CP at 399. We have been directed to nowhere in the record that Ms. Mikkelsen disagrees with that account. When asked in deposition why she felt Mr. Ward's statement about making a scene was inappropriate, she answered only, "I rather doubt he would have said something like that to my male contemporaries." CP at 88.

Her only evidence of ageist comments during her 15 months of working with Mr. Ward was offered in deposition after being asked, "[W]as there ever a statement made to you that supports your contention that you were terminated because of your age?" She answered yes, and recounted a statement Mr. Ward had made about an employee being "old and stale" that she found offensive:

> Q. Did Mr. Ward identify who he was talking about?
> A. Gerard.
> Q. And how old was Gerard at the time of this statement?
> A. He was in his 50s, late 50s, when he retired, I think.
> Q. And so what exactly do you recall Mr. Ward saying about Mr. Gerard?

29

Q.    A. I can't say exactly. I can just say that Gerard had worked there for a lot of years and he made a comment that he just—it's just amazing that he could only work for one employer in all those years.

Q. So what does that have to do with age?

A. In order to work all those years, you got to be old.

Q. So any other statement . . . by Mr. Ward that you feel support[s] your contention that you were fired because of your age.

A. That's it. If I have others, I am—I don't recall them right now.

CP at 89-91. She did not recall others during her deposition. She did testify that Mr. Ward had a "fixation" on the age of 72-year-old PUD employee Nickie Buchanan, explaining that Ms. Buchanan told her Mr. Ward seemed to be very focused on her age. *Id.* at 90. No testimony of Ms. Buchanan was offered in opposition to summary judgment.

Not only do we find these remarks, occurring over a 15-month period, to be unpersuasive evidence of a discriminatory attitude on Mr. Ward's part, but there is no evidence that any employee ever found them objectionable enough to raise them under the PUD's sexual harassment policy. As Ms. Mikkelsen's materials point out, the PUD's then 20-year-old policy stated, "Prompt action shall be taken when a question or situation is brought to the attention of the appropriate person." CP at 558.

Last is Ms. Mikkelson's claim that when Mr. Ward came into her office, "prior to his taking a seat, he would reach into his pockets and rearrange his genitals." CP at 88. As far as we can tell from the record, the first time this was brought to the attention of anyone at the PUD was when Ms. Mikkelsen was deposed on June 19, 2014. It was not

reflected in the memorandum and notes of complaints she maintained during her employment. She admits she never raised it with Mr. Ward. When deposed, she claimed reluctance to raise it ("I had not wanted to say this, but I'm going to have to. . . . I find it offensive that I even have to say that."). CP at 88. Whether because of her stated reluctance or for some other reason, none of the lawyers asked her for more specific information or detail. Absent information from which to determine whether any reasonable person in Ms. Mikkelsen's position would have viewed Mr. Ward's conduct as evidence of misogyny or as simply a man hoping to sit without discomfort, we cannot treat it as evidence of a discriminatory animus.

The evidence of discrimination Ms. Mikkelsen offers is insufficient to permit a rational finder of fact to infer that the termination of her employment by Mr. Ward was more likely than not substantially motivated by discrimination.

Affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

## *II. Breach of policy*

Ms. Mikkelsen next contends her discharge without notice or progressive discipline violated the corrective action policy adopted by the PUD commissioners in

31

November 2009. While an employment contract indefinite in duration is ordinarily terminable at will in Washington, she relies on two exceptions to the rule that our Supreme Court first recognized in *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 233, 685 P.2d 1081 (1984). The first exception is based on contractual modification. The second is based on promises of specific treatment in specific situations, on which an employee justifiably relies.

### *Contract modification theory of enforceability*

Under the first exception, an employer's issuance of a manual or policy may modify an employment contract where "the requisites of contract formation, offer, acceptance and consideration" establish that the new manual or policy has become part of a modified employment contract. *Id.* at 228. Focusing on the elements of contract formation and breach are key to avoiding confusion between *Thompson*'s contract modification and justifiable reliance theories for enforcing employer policies. *DePhillips v. Zolt Constr. Co.*, 136 Wn.2d 26, 35-36 & n.5, 959 P.2d 1104 (1998). "The difference is clear when the elements of the causes of action are compared." *Id.* at 36.

"To establish a modification, the party asserting the modification must show, through the [words] [or] [conduct] of the parties, that there was an agreement of the parties on all essential terms of the contract modification, and that the parties intended the new terms to alter the contract." *See* 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 301.07, at 212 (6th ed. 2012) (WPI); *Swanson v.*

32

*Liquid Air Corp.*, 118 Wn.2d 512, 523-24, 826 P.2d 664 (1992); *Amoco Prod. Co. v. Houghton Energy Corp.*, 11 F. Supp. 2d 1270, 1278 (D. Kan. 1998) ("An agreement to modify a contract is itself a contract."). Generally, a modification requires consideration or a mutual change in obligations and rights. *Dragt v. Dragt/DeTray, LLC*, 139 Wn. App. 560, 576, 161 P.3d 473 (2007); WPI 301.07, cmt. *But cf.* RESTATEMENT (SECOND) OF CONTRACTS § 89 (AM. LAW INST. 1981) (identifying when modification of executory contracts may be binding without consideration).

In *Swanson*, contract modification was established where the employer prepared a memorandum of working conditions to quell employee dissent and discussed it extensively with affected employees over a period of two days. 118 Wn.2d at 515-16. The promise was "specific enough to constitute an enforceable contract term" and the employer "almost certainly offered the Memorandum in consideration for the employees' promise not to unionize and the employees almost certainly accepted it in consideration for the forgoing of their legal right to unionize." *Id.* at 524.

Although the question of whether an employer has made a contract offer is a question of fact, "if reasonable minds cannot differ as to whether language sufficiently constitutes an offer . . . as a matter of law the claimed promise cannot be part of the employment relationship." *Id.* at 522.

A claim that an employer has made a contract offer can fail as a matter of law when it is directly negated by other communications by the employer, as illustrated by

33

*Kuest v. Regent Assisted Living, Inc.*, 111 Wn. App. 36, 51, 43 P.3d 23 (2002). In *Kuest*, an express disclaimer in the employee's original employment contract stated that her employment was at will and that the employer's policies did not constitute a contract. She was thereafter given a supervisor's manual containing a progressive discipline policy and was instructed to use it; at about the same time she received an employee manual that repeated the disclaimer included in her contract. Although she argued that the progressive disciplinary policy and instructions to use it modified her at-will employment, the court held—based on the disclaimer and the absence of consideration— that "[m]aterial facts are not at issue regarding all the required elements of contract formation" and that the trial court properly dismissed the claim. *Id.*

In this case, a number of provisions of the corrective action policy negate any possibility that by adopting and publishing it, the PUD's commissioners were offering to modify the at-will nature of Ms. Mikkelsen's employment. For present purposes, one provision of the policy is sufficient to dispel that argument:

> The rules set out here are intended only as guidelines, and do not give any employee a right to continued employment or any particular level of corrective action.

CP at 346 (Corrective Action Policy § 2). As a matter of law, Ms. Mikkelsen's at-will employment was not modified by the commissioner's adoption of the policy.

34

*Promises of specific treatment*

The second exception to the terminable at-will character of employment for an

indefinite term exists where

> an employer, for whatever reason, creates an atmosphere of job security and
> fair treatment with promises of specific treatment in specific situations and
> an employee is induced thereby to remain on the job and not actively seek
> other employment, those promises are enforceable components of the
> employment relationship.

*Thompson*, 102 Wn.2d at 230 (emphasis omitted). In recognizing this exception, the

*Thompson* court observed that an employer can write policies using language that "may

not amount to promises of specific treatment and merely be general statements of

company policy and thus, not binding." *Id.* at 231. "Moreover, the employer may . . .

write them in a manner that retains discretion to the employer." *Id.*

The elements of a justifiable reliance claim are (1) a promise contained in an

employee manual or handbook or the like, (2) the employee's justifiable reliance, and (3)

breach by the employer. *DePhillips*, 136 Wn.2d at 35. "In particular, the justifiable

reliance element takes the claim out of the traditional contract realm." *Id.*

The PUD's corrective action policy can be read only as general statements of a

discretionary company policy. Its first page states:

1.1    Corrective Action

> Corrective action should be fair. This means, *while the District
> retains the discretion to determine what action is appropriate in any
> particular situation*, the corrective action should be equal with the

35

misconduct or performance deficiency at issue, and whenever possible, performance issues typically should be addressed, at least initially, with an eye to improvement.

CP at 343 (emphasis added).

The second page states:

2.0 Reasons for Corrective Action

These are *only guidelines.* To be able to respond appropriately to whatever particular circumstances may arise in the future, *the District must[] reserve the right to determine the categorization of, and response to, any conduct or performance concern, regardless of where it falls within the broad parameters set forth below.*

CP at 344 (emphasis added).

As already observed, the fourth page of the policy states that "[t]he rules set out here are intended only as guidelines, and do not give any employee a right to continued employment or any particular level of corrective action." CP at 346. Elsewhere, it states:

3.0 Corrective Action

. . . However, this is *only a guideline.* The District *does not promise employees a specific formula of corrective action will be followed in every instance.* Different circumstances warrant different responses. Unless otherwise prohibited by law, when the District concludes an employee has not adhered to its standards or performance otherwise is unsatisfactory, the District *may take the corrective action it decides is appropriate under the circumstances, which may involve any one or combination of the steps identified below, up to and including immediate discharge without prior corrective action or notice.*

CP at 346 (emphasis added). Finally, in listing different types of corrective action, the policy identifies the type of conduct or offense in connection with which each is "generally" used. CP at 346-47.

There is only one use of mandatory language in the entire policy: paragraph 1.3, which states, "Corrective action *must* be administered with due consideration of, and respect for, employee rights and expectations, whether those rights and expectations derive from employment policies, operation of law, or contract." CP at 344 (emphasis added). As an example, it cites a union employee's contractual right to union representation.

Although "must" is mandatory, two things diminish the significance of the statement. The first is that it appears in a policy that makes the PUD's use of corrective action optional. In context, the provision means that *if* corrective action is used, *then* it must be administered with due consideration of employee rights and expectations.

The second is that unlike the PUD's union-represented employees, Ms. Mikkelsen cannot point to any "right or expectation" that needed to be considered or respected in taking corrective action against her. Her employment contract was terminable at will; she does not rely for her breach of policy claim on any right arising from "operation of law;" and the corrective action policy itself takes pains to avoid creating employee rights or expectations by emphasizing its discretionary character.

37

In using almost entirely discretionary language and one inconsequential mandatory term, the PUD's policy is like others that Washington courts have held, as a matter of law, to make no enforceable promise of specific treatment. *See, e.g., Quedado v. Boeing Co.*, 168 Wn. App. 363, 372, 276 P.3d 365 (2012) (company policies did not promise that it would adhere to a matrix of recommended disciplinary sanctions); *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 95, 993 P.2d 259 (2000) (nature of performance evaluation was discretionary); *Drobny v. Boeing Co.*, 80 Wn. App. 97, 105, 907 P.2d 299 (1995) (policy retained employer's discretion to discharge employees without progressive discipline); *McClintick v. Timber Prods. Mfg., Inc.*, 105 Wn. App. 914, 922, 21 P.3d 328 (2001) (employment guidebook contained "no terms such as 'shall,' 'will,' or 'must' that indicate the practice is mandatory").[8] Summary judgment dismissal of the breach of policy claims was appropriate.

### III. Negligent hiring and supervision

Ms. Mikkelsen next argues that the PUD negligently hired and supervised Mr. Ward.

> A negligent supervision claim requires showing: (1) an employee acted outside the scope of his or her employment; (2) the employee presented a risk of harm to other employees; (3) the employer knew, or should have known in the exercise of reasonable care, that the employee posed a risk to

---

[8] Given the clearly discretionary language of the policy, the fact that it had been applied to two employees, neither presenting a problem of discord and friction at the management level, adds nothing to Ms. Mikkelsen's argument.

others; and (4) that the employer's failure to supervise was the proximate cause of injuries to other employees.

*Briggs v. Nova Servs.*, 135 Wn. App. 955, 966-67, 147 P.3d 616 (2006), *aff'd*, 166 Wn.2d 794, 213 P.3d 910 (2009). The only "difference between negligent hiring and negligent retention is the time at which the employer's negligence occurs." *Peck v. Siau*, 65 Wn. App. 285, 288, 827 P.2d 1108 (1992).

Ms. Mikkelsen contends the PUD negligently hired Mr. Ward because it knew of his work history, which included short-tenure jobs. But there is no evidence of the reasons for Mr. Ward's moves from one job to another, and the PUD hired Langely & Associates to vet potential candidates and contact references. Asked in her deposition about any mistakes the board made in the hiring process, Ms. Mikkelsen conceded, "I don't think this is the board's fault. I think it's the headhunter." CP at 127. She also admitted that Mr. Ward's references were checked but she understood that prior employers did not tell the truth. As a matter of law, she demonstrates no negligence in the PUD's hiring of Mr. Ward.

Ms. Mikkelsen claims negligent supervision of Mr. Ward because she informed Commissioner Hanson of the way Mr. Ward was treating her, thereby putting the PUD on notice, and yet he took no action. By her own report, she spoke with Commissioner Hanson on July 24, 2011. She was fired on August 22. She does not identify any action outside the scope of Mr. Ward's employment as general manager that he took during that

39

less than one month time frame, during which most of which he was out of town for his daughter's wedding.

She also does not identify any injury proximately caused by actions outside the scope of Mr. Ward's authority during that time frame. Injury is an element of the claim. Although she baldly states, "There is no question as to the proximate cause issue," Brief of Appellant at 49, she appears to be referring to the fact that Mr. Ward fired her. Firing her was *within* the scope of Mr. Ward's authority. *See* RCW 54.16.100 ("The manager shall . . . hire and discharge employees under his or her direction"). If wrongful, it can be the basis of vicarious liability, but it cannot be the basis of a negligent supervision claim. *LaPlant v. Snohomish County*, 162 Wn. App. 476, 271 P.3d 254 (2011).

Summary judgment dismissal of the negligent hiring and supervision claims was proper.

*IV. Intentional infliction of emotional distress*

Finally, Ms. Mikkelsen claims Mr. Ward and the PUD are liable for intentional infliction of emotional distress in the form of Mr. Ward's discrimination; his firing her from her job, which resulted in lost income and a loss of insurance and retirement benefits; and negative statements about her performance that made their way into local news reports and other materials available on the Internet.

To establish a claim of intentional infliction of emotional distress, the plaintiff must show (1) outrageous and extreme conduct by the defendant, (2) the defendant's

40

intentional or reckless disregard of the probability of causing emotional distress, and (3) actual result to the plaintiff of severe emotional distress. *Commodore v. Univ. Mech. Contractors, Inc.*, 120 Wn.2d 120, 135, 839 P.2d 314 (1992). "Liability exists 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975) (emphasis omitted) (quoting RESTATEMENT (SECOND) of TORTS § 46 cmt. d. (AM. LAW INST. 1965)). Liability "'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' In this area plaintiffs must necessarily be hardened to a certain degree of rough language, unkindness and lack of consideration." *Id.*

When the conduct a plaintiff complains of is within a defendant's legal rights, it is privileged, whether or not extreme and whether or not the defendant is aware that insisting on his legal rights is certain to cause emotional distress. RESTATEMENT (SECOND) OF TORTS § 46 cmt. g. The PUD can have no liability, then, for terminating Ms. Mikkelsen's at-will employment even if Mr. Ward and the commissioners could foresee that losing her job, and the related loss of benefits, would cause her emotional distress.

The trial court serves a "gatekeeping role" in determining what qualifies as outrage. *Steinbock v. Ferry County Pub. Util. Dist. No. 1*, 165 Wn. App. 479, 492, 269

41

P.3d 275 (2011). Even viewed in the light most favorable to Ms. Mikkelsen, her evidence does not raise a jury question. Losing a long-term job and being unfavorably described by a former employer could, of course, be upsetting, but that and the other conduct about which she complains amount, at most, to indignities, annoyances, rough language, unkindness, or lack of consideration. They are not beyond all possible bounds of decency. *Compare Strong v. Terrell*, 147 Wn. App. 376, 195 P.3d 977 (2008) (affirming summary judgment dismissal where supervisor screamed at employee daily; criticized her work; told "dumb blonde" jokes; ridiculed her personal life; and disparaged her house, her husband's job, and her decision to place her son in therapy), *with Grimsby*, 85 Wn.2d 52 (husband was required to watch helplessly as his wife suffered and died).

Ms. Mikkelsen's evidence of her emotional distress also fails to raise a genuine issue of fact. Objective symptomatology is not required to demonstrate severe emotional distress. *Kloepfel v. Bokor*, 149 Wn.2d 192, 198, 66 P.3d 630 (2003). "Severe emotional distress is, however, not 'transient and trivial' but distress such 'that no reasonable man could be expected to endure it.'" *Id.* at 203 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. j.).

Ms. Mikkelsen's conclusory characterization of her emotional distress relies chiefly on worry and concern arising from financial setback from termination of her employment, but since the termination of her employment is not actionable, resulting distress is not compensable. Especially after setting that aside, her report of

embarrassment, humiliation, anger, grief, and worry do not rise to the unendurable level. *Compare Brower v. Ackerley*, 88 Wn. App. 87, 943 P.2d 1141 (1997) (finding issue of fact where plaintiff experienced acute anxiety, secured his house, gathered his wife and cats in an upstairs bedroom, was nervous, unable to sleep, was very agitated and upset for days, and was afraid to appear in public), *with Spurrell v. Bloch*, 40 Wn. App. 854, 701 P.2d 529 (1985) (no issue of fact where plaintiffs claimed a sleepless night, tears, loss of appetite, and anxiety after their children were removed from their home without notification).

Again, summary judgment dismissal was proper.

Affirmed.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Lawrence-Berrey, A.C.J.