

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE OCT 19 2017
Fairhurst, CJ
*CHIEF JUSTICE*

This opinion was filed for record

at 8:00 A.m. on October 19, 2017

_____, Deputy
for SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| KIM MIKKELSEN, | ) | NO. 93731-1 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | EN BANC |
| | ) | |
| PUBLIC UTILITY DISTRICT NO. 1 OF | ) | |
| KITTITAS COUNTY; JOHN HANSON; | ) | |
| PAUL ROGERS; ROGER SPARKS; and | ) | Filed      OCT 19 2017 |
| CHARLES WARD, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

FAIRHURST, C.J.—The Public Utility District No. 1 of Kittitas County (district) fired Kim Mikkelsen after 27 years of service. Mikkelsen sued the district, alleging that, among other things, her dismissal violated the Washington Law Against Discrimination (WLAD), RCW 49.60.180. Specifically, Mikkelsen claims that Charles Ward, the general manager, exhibited a bias against women and older employees and that gender and age discrimination were substantial factors in his decision to fire her. She also argues that her dismissal violates the progressive correction action policy the district distributed to its employees.

First, we wish to clarify that under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), a plaintiff need not prove that she was replaced by a member outside her protected class in order to establish a prima facie case of discrimination. We affirm summary judgment dismissal of Mikkelsen's age discrimination claim because Mikkelsen presented almost no evidence of age discrimination. But we reverse summary judgment dismissal of Mikkelsen's gender discrimination claim because the facts taken in the light most favorable to her create a material issue of fact about whether gender discrimination was a substantial factor in Ward's decision to fire her. The corrective action policy is ambiguous and could plausibly be read as establishing a for-cause standard for dismissal; we therefore reverse and remand that issue.

## I. FACTS AND PROCEDURAL HISTORY

Mikkelsen began working for the district in 1984, when she was 30 years old. Mikkelsen entered into an employment contract assigning her duties as manager of accounting and finance for the district. She worked for the district part time to accommodate her consulting business, which involved advising other utility businesses on financing, administration, and accounting issues. The district has a three member board of commissioners (Board) that directs operations. The Board hires a general manager to oversee day-to-day operations. The general manager works with a three member management team.

From 1984 to 2009, Mikkelsen and the district thrived under three different general managers. In 2009, however, Mikkelsen and three other employees became concerned with the actions of then general manager Mark Kjelland. The employees sent a letter to the Board expressing their concerns in compliance with the district's whistleblower policy. Kjelland resigned from his position, and the Board did not investigate the complaints. Following Kjelland's resignation, the Board asked Mikkelsen to serve as an interim general manager. Mikkelsen accepted the position. The Board later asked Mikkelsen to serve permanently as the general manager, but she declined. The Board hired Ward as general manager in July 2010.

During her time as interim general manager, Mikkelsen spearheaded the adoption of a "Corrective Action Policy" for the district. Clerk's Papers (CP) at 317. At the time, the district had no such policy, which led to confusion and uncertainty when employees required discipline. Mikkelsen adapted a corrective action policy from Chelan County Public Utility District. The district management team and the Board held meetings discussing the proposed policy. The Board ultimately adopted the policy. Mikkelsen used the policy while interim general manager, issuing a verbal warning to a line worker and documenting the warning in the employee's personnel file. Ward also used the policy as general manager, issuing a verbal warning to a different employee while Mikkelsen assisted as a witness.

Once Ward began as general manager, Mikkelsen resumed her former position as finance manager. Mikkelsen served on the management team under Ward along with Matt Boast and Brian Vosburgh. Mikkelsen was the only female member of the management team.

Mikkelsen and Ward worked well together at first, but their relationship eventually deteriorated. According to Mikkelsen, Ward exhibited a unilateral, "'my way or the highway'" management style. CP at 334. Mikkelsen alleged that Ward would make impulsive decisions without gathering information and considering the various consequences to the district. Mikkelsen also claimed that Ward was sometimes belligerent with her and would undermine her authority by calling her "'untrustworthy'" during meetings with other employees. *Id.*

Mikkelsen believed that Ward's conduct was due in part to gender bias. She testified that Ward "had a difficult time with women in upper management." CP at 86. For example, Ward often talked over Mikkelsen in meetings. Ward would also regularly disregard Mikkelsen's input. The male members of the management team did not experience this same treatment.[1]

In December 2010, Ward began excluding Mikkelsen from communications in which she typically participated. Ward discussed management issues over e-mail with

---

[1] "What I'm saying is, if I suggested something, most likely it would not have been approved by [Ward]. But if it was suggested by [Boast or Vosburgh] [the male members of the management team], he would approve it." CP at 435-36.

- 4 -

the male members of the management team, but he would not include Mikkelsen. Ward also held some meetings without including Mikkelsen. When Ward first began as general manager, he would have Mikkelsen act as acting manager when he was away from the office. But eventually, he stopped asking Mikkelsen to serve as acting manager and asked only the male members of the management team, Boast and Vosburgh.

Mikkelsen testified that Ward would frequently refer to the women at the office as the "'girls,'" "'gals,'" or "'ladies,'" but he never referred to the men as "'guys,'" "'men,'" or "'boys.'" CP at 318. During union negotiations regarding uniforms, Ward mentioned he would wear any uniform paid for by the district as long as it was not pink. Mikkelsen also claims that Ward would regularly rearrange his genitals when he was around her or sitting in front of her. Mikkelsen did not witness Ward engage in this same behavior around male employees. Mikkelsen claims that when she asked Vosburgh about Ward's behavior, Vosburgh told her that Ward has "got a guy/girl thing with you." CP at 87.[2]

In March 2011, Mikkelsen arranged a meeting with Ward to address their communication breakdown and Ward's alleged gender bias. Ward told Mikkelsen that he trusted her and that he would improve his behavior. Mikkelsen took notes during

---

[2] However, Mikkelsen provided no testimony from Vosburgh supporting this statement to oppose the district's motion for summary judgment. As the Court of Appeals noted, the statement is inadmissible hearsay. *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County*, 195 Wn. App. 922, 946 n.7, 380 P.3d 1260 (2016).

the meeting, and shortly afterward she noted that she "did not feel that [Ward] took ownership of any gender bias or going around me to avoid ideas that may not be in agreement with his." CP at 335. According to Mikkelsen, Ward's behavior did not improve after this meeting.

In July 2011, communication between Mikkelsen and Ward had largely ceased. John Hanson, the president of the Board, was apparently aware of the issue and called Mikkelsen to see how things were going. After Mikkelsen told Hanson about Ward's behavior, Hanson asked her what the Board could do. Mikkelsen suggested conducting an anonymous survey to see if other employees shared her concerns. Hanson asked Mikkelsen to create the survey. Although the survey does not mention Ward by name, it contains many questions about the "General Manager," including a question that asked whether "[t]he General Manager is biased on the basis of gender." CP at 265.

Mikkelsen e-mailed the survey to the Board, but she did not send the survey to Ward. Mikkelsen admitted that Ward might interpret this decision as "going behind his back." CP at 96. Roger Sparks, a member of the Board, suggested no action regarding the survey until Ward returned from vacation. When Ward returned, Sparks notified him about the survey, and Ward promptly fired Mikkelsen. Ward testified the survey proved Mikkelsen was "out to get [him] and make the [district] look bad." CP at 152. In August 2011, Ward invited Mikkelsen into his office and informed her she was fired because "'it's not working out.'" CP at 319. Ward read from a script and

did not provide Mikkelsen with any other reason for her termination. Mikkelsen asked for a copy of her personnel file, which Ward provided. Mikkelsen's personnel file contained no adverse history of being reprimanded, admonished, or disciplined while employed at the district.

Ward wrote a memo to the Board explaining the termination. In the memo, Ward accuses Mikkelsen of disrupting the workplace and undermining his authority. He describes the early months as positive, but claims that Mikkelsen became combative and insubordinate as time went on. He claims that Mikkelsen disrespected him regularly, disagreed with his management choices, made unreasonable requests, and kept information about billing from him.

In response to the Employment Security Department's inquiry after Mikkelsen applied for unemployment benefits, the district explained Mikkelsen's termination by writing that "Mikkelsen was an 'at will' employee and was terminated without cause." CP at 402. The same form provides a series of boxes indicating the reasons for the discharge, including insubordination, dishonesty, and the violation of company rules. The district checked none of these boxes.

Mikkelsen was 57 years old when Ward fired her. The district replaced Mikkelsen with Genine Pratt, then 51 years old. In December 2011, the Board fired Ward for reasons not in the record.

On November 8, 2011, Mikkelsen sued the district, the Board, and Ward for wrongful discharge. She alleged that she was terminated in violation of the district's corrective action policy and in violation of WLAD. Specifically, she claimed that age and gender discrimination were substantial factors in her dismissal. She also alleged that the district had negligently hired Ward and that her discharge amounted to intentionally inflected emotional distress. The trial court granted the defendants' motion for summary judgment and dismissed all of Mikkelsen's claims with prejudice. The Court of Appeals, Division Three, affirmed in a partially published opinion. *See Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County*, 195 Wn. App. 922, 380 P.3d 1260 (2016). Mikkelsen sought this court's review regarding the discrimination issue and the corrective action policy issue. We granted her petition for review. *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County*, 187 Wn.2d 1009, 388 P.3d 495 (2017).

## II. ISSUES

A.    Is the replacement element required to establish a prima facie case of discrimination under the *McDonnell Douglas* framework?

B.    Can Mikkelsen show a genuine issue of material fact as to whether the discrimination was a substantial factor in her dismissal?

C.    Can Mikkelsen show a genuine issue of material fact as to whether the corrective action policy modified her at-will employment status?

## III. ANALYSIS

### A. Standard of review

We review a trial court's grant of summary judgment de novo. *Camicia v. Howard S. Wright Constr. Co.*, 179 Wn.2d 684, 693, 317 P.3d 987 (2014). Summary judgment is proper only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We consider all facts and reasonable inferences in the light most favorable to the nonmoving party—here, Mikkelsen. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 226, 770 P.2d 182 (1989).

### B. The *McDonnell Douglas* framework

WLAD prohibits employers from discharging any employee on the basis of a protected characteristic, including age and gender. RCW 49.60.180(2). But "[d]irect, 'smoking gun' evidence of discriminatory animus is rare, since '[t]here will seldom be "eyewitness" testimony as to the employer's mental processes.'" *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 179, 23 P.3d 440 (2001) (second alteration in original) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)). Accordingly, we have repeatedly emphasized that plaintiffs may rely on circumstantial, indirect, and inferential evidence to establish discriminatory action. *Id.* at 180. "'Indeed, in discrimination cases it will seldom be

otherwise.'" *Id.* (quoting *deLisle v. FMC Corp.*, 57 Wn. App. 79, 83, 786 P.2d 839 (1990)).

Because intentional discrimination is difficult to prove, we have adopted the evidentiary burden-shifting scheme announced in *McDonnell Douglas. See Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 362, 753 P.2d 517 (1988). "'The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff [has] his [or her] day in court despite the unavailability of direct evidence.'" *Hill*, 144 Wn.2d at 180 (alterations in original) (internal quotation marks omitted) (quoting *Sellsted v. Wash. Mut. Sav. Bank*, 69 Wn. App. 852, 864, 851 P.2d 716 (1993)).

The *McDonnell Douglas* framework has three steps:

First, the plaintiff must make a prima facie case of discrimination by showing that (1) she was within a statutorily protected class, (2) she was discharged by the defendant, (3) she was doing satisfactory work, and (4) after her discharge, the position remained open and the employer continued to seek applicants with qualifications similar to the plaintiff. *McDonnell Douglas*, 411 U.S. at 802; *see also Grimwood*, 110 Wn.2d at 362. If the plaintiff establishes a prima facie case, it creates a rebuttable presumption of discrimination. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 446, 334 P.3d 541 (2014).

Second, the burden shifts to the defendant, who must "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.*

Third, if the defendant meets this burden, the plaintiff must produce sufficient evidence showing that the defendant's alleged nondiscriminatory reason for the adverse employment action was a pretext. *Id.* "An employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer." *Id.* at 446-47.

Summary judgment for an employer is seldom appropriate in employment discrimination cases because of the difficulty of proving discriminatory motivation. *Id.* at 445. "When the record contains reasonable but competing inferences of both discrimination and nondiscrimination, the trier of fact must determine the true motivation." *Id.* (citing *Rice v. Offshore Sys., Inc.*, 167 Wn. App. 77, 90, 272 P.3d 865 (2012)). To overcome summary judgment, the plaintiff needs to show only that a reasonable jury could find that discrimination was a substantial factor in the employer's adverse employment action. *Mackay v. Acorn Custom Cabinetry, Inc.*, 127 Wn.2d 302, 310, 898 P.2d 284 (1995).

C.   The replacement element is not essential to establishing a prima facie case of discrimination under *McDonnell Douglas*

To establish a prima facie case of discrimination, Washington courts have held that plaintiffs must prove that they were replaced by someone outside of their protected group—the replacement element. *See, e.g., Domingo v. Boeing Emps. Credit Union,* 124 Wn. App. 71, 80, 98 P.3d 1222 (2004) (requiring the plaintiff to prove that she "was replaced by a person of the opposite sex or otherwise outside the protected group"); *see also Grimwood,* 110 Wn.2d at 362. Despite this, the Court of Appeals held that the plaintiff need not prove the replacement element to establish a prima facie case. *Mikkelsen,* 195 Wn. App. at 942-43. The parties do not dispute this issue. Instead, they disagree as to the second and third steps of the *McDonnell Douglas* test— whether the district articulated a legitimate, nondiscriminatory reason for Mikkelsen's dismissal and whether Mikkelsen demonstrated that reason was pretext. Regardless, we address the issue in order to clarify that the replacement element is not required to prove a prima facie case of discrimination under the first step of the *McDonnell Douglas* framework.

A review of federal authority reveals that the replacement element may have been erroneously included in Washington courts' application of the *McDonnell Douglas* framework. Indeed, no United States Supreme Court authority, including *McDonnell Douglas,* requires the replacement element. In *McDonnell Douglas,* a

failure-to-hire case, the court held that a plaintiff establishes a prima facie case of discrimination by showing

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802. Some courts, including this one, reformulated these requirements for wrongful discharge and required that the plaintiff show he was replaced by someone outside his protected class. *See Roberts v. Atl. Richfield Co.*, 88 Wn.2d 887, 568 P.2d 764 (1977). In *Roberts*, an age discrimination case, we relied on a Fifth Circuit Court of Appeals case to hold that a prima facie case of discrimination required a showing that the plaintiff "'was replaced by a younger person.'" *Id.* at 892 (quoting *Wilson v. Sealtest Foods Div. of Kraftco Corp.*, 501 F.2d 84, 86 (5th Cir. 1974)).

Since *Roberts*, we have used the same formulation for age discrimination and other contexts. *See, e.g., Hill*, 144 Wn.2d at 188 (age discrimination); *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 150, 94 P.3d 930 (2004) (disabled plaintiff demonstrated prima facie case by showing he was replaced by nondisabled person). Relying on this authority, the Court of Appeals has generally required that a discharged plaintiff show replacement by a person from "outside the protected class." *Kuest v. Regent Assisted Living, Inc.*, 111 Wn. App. 36, 44, 43 P.3d 23 (2002).

The United States Supreme Court has not addressed whether the replacement element is a necessary part of the *McDonnell Douglas* framework, but it did cast doubt on the element in *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996). There, the Court addressed whether the petitioner was discharged in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621-634. *Id.* at 309. The Fourth Circuit Court of Appeals held that in order to establish a prima facie case of discrimination, the petitioner needed to prove that "he was replaced by someone of comparable qualifications outside the protected class." *Id.* at 310. The Court disagreed with this element because the statute restricted the protected class to individuals aged 40 or older. *Id.* at 311-12; 29 U.S.C. § 631(a). The Court concluded this limitation is irrelevant to whether an employer discharged an employee for discriminatory reasons:

> This language [in the ADEA] does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older. *The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant*, so long as he has lost out because of his age. . . . Because it lacks probative value, the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case.

*O'Connor*, 517 U.S. at 312 (emphasis added).

Federal courts have relied on *O'Connor* to diminish and even dispense with the replacement element in other discrimination contexts. *See, e.g., Pivirotto v. Innovative*

*Sys., Inc.*, 191 F.3d 344, 354-55 (3d Cir. 1999). Nearly every federal court addressing the issue has held that a discharged employee need not prove she was replaced by someone outside her protected class in order to establish a prima facie case of discrimination under *McDonnell Douglas*. *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 154-55 (1st Cir. 1990); *Meiri v. Dacon*, 759 F.2d 989, 995-96 (2d Cir. 1985); *Pivirotto*, 191 F.3d at 354-55; *Nieto v. L&H Packing Co.*, 108 F.3d 621 (5th Cir. 1997); *Jackson v. Richards Med. Co.*, 961 F.2d 575, 587 n.12 (6th Cir. 1992); *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157 (7th Cir. 1996); *Walker v. St. Anthony's Med. Ctr.*, 881 F.2d 554, 558 (8th Cir. 1989); *Perry v. Woodward*, 199 F.3d 1126 (10th Cir. 1999); *Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1534 (11th Cir. 1984). These courts generally recognize that rigid application of the replacement element could result in dismissing meritorious claims. *See, e.g.*, *Pivirotto*, 191 F.3d at 354 ("The fact that a female plaintiff claiming gender discrimination was replaced by another woman might have some evidentiary force . . . . But this fact does not, as a matter of law or logic, foreclose the plaintiff from proving that the employer was motivated by her gender . . . when it discharged her.").

But not all of these courts apply the *McDonnell Douglas* framework uniformly. As the Tenth Circuit Court of Appeals noted in *Perry*, although most federal courts "do not preclude a plaintiff from meeting the prima facie burden when the replacement or new hire shares the protected attribute," some still require an "additional fact" giving

rise to "an inference of discrimination." *Perry*, 199 F.3d at 1138. The *Perry* court rejected this approach because it leads to uncertainty in the trial courts. *Id.* Instead, the First, Second, and Tenth Circuits have dispensed with the replacement element and held that a plaintiff need only show that her position was not eliminated. *Id.*

This approach embraces "the basic standard originally articulated in *McDonnell Douglas* which only required a plaintiff to show that the employer continued to seek applicants." *Id.* 1139; *McDonnell Douglas*, 411 U.S. at 802. The purpose of establishing the prima facie elements under *McDonnell Douglas* is to "eliminate[] the most common nondiscriminatory reasons for the plaintiff's rejection," namely, that the plaintiff is unqualified for the position or that the position no longer exists. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Therefore, "[a]n inference of discrimination is raised when an employer rejects an otherwise qualified minority employment candidate and thereafter does not eliminate the position for which the candidate was rejected." *Perry*, 199 F.3d at 1140.

We agree with *Perry* and clarify that the *McDonnell Douglas* framework does not require a plaintiff to prove that she was replaced by a person outside her protected group to establish a prima facie case of discrimination. We already expressed some skepticism toward the replacement element in *Grimwood*. There, we emphasized that the *McDonnell Douglas* elements "are not absolutes" and that they were not intended to be "'rigid, mechanized, or ritualistic.'" 110 Wn.2d at 362-63 (internal quotation

marks omitted) (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1017 (1st Cir. 1979)). Relying on *Loeb*, we noted that "the element of replacement by a younger person or a person outside the protected age group is not absolute; rather, the proof required is that the employer 'sought a replacement with qualifications similar to his own, thus demonstrating a continued need for the same services and skills.'" *Id.* at 363 (quoting *Loeb*, 600 F.2d at 1013). This reasoning is consistent with the original framework articulated in *McDonnell Douglas* and other federal authority that requires only that a plaintiff prove membership in a protected class, termination from a job for which she was qualified, and that the employer continued to seek candidates for the position.

This does not mean that the discharged employee's replacement is irrelevant. Indeed, "the attributes of a successor employee may have evidentiary force in a particular case." *Cumpiano*, 902 F.2d at 155. We hold only that a plaintiff need not prove the replacement element to establish a prima facie case of discrimination. After establishing a prima facie case, the attributes of a successor employee may be relevant to the second or third steps under the *McDonnell Douglas* framework.

D. Mikkelsen has demonstrated an issue of material fact as to whether gender discrimination was a substantial factor in her dismissal—but not as to age discrimination

The parties agree with the Court of Appeals' rejection of the replacement element, and therefore they seem to agree that Mikkelsen satisfied her initial burden by establishing a prima facie case of discrimination. They dispute the second and third

steps under *McDonnell Douglas*—whether the district presented a legitimate, nondiscriminatory reason for Mikkelsen's discharge and whether Mikkelsen presented sufficient evidence showing that the district's proffered reason is pretext.

Under *McDonnell Douglas*, after the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer, who must articulate a legitimate, nondiscriminatory reason for the adverse employment action.[3] *Scrivener*, 181 Wn.2d at 446. The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254. The employer's burden is merely one of production, rather than persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). The employer need only introduce "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.* at 509.

The district satisfied its burden here. When Ward fired Mikkelsen, he told her that "'it's not working out.'" CP at 319. Ward wrote a memo to the Board, detailing Mikkelsen's alleged history of disruptive and insubordinate behavior. Mikkelsen's own testimony supports the inference that she and Ward had a dysfunctional professional relationship. This is a legitimate, nondiscriminatory reason for Mikkelsen's discharge. *See, e.g., Thornton v. Neiman Marcus*, 850 F. Supp. 538, 543

---

[3] Briefly, we note that because the replacement element need not be proved, Mikkelsen easily carries her initial burden. It is undisputed that she is a member of a protected class, that she was discharged, that she was qualified for the position, and that the district looked for and replaced her with a candidate possessing similar qualifications.

(N.D. Texas 1994) (employer articulated legitimate, nondiscriminatory reason for termination by demonstrating plaintiff's "insubordination, poor work habits, and history of disciplinary problems").

Under the final step of the *McDonnell Douglas* framework, the plaintiff must produce sufficient evidence showing that the defendant's alleged nondiscriminatory reason for the adverse employment action was a pretext. *Scrivener*, 181 Wn.2d at 446. "An employee does not need to disprove each of the employer's articulated reasons to satisfy the pretext burden of production." *Id.* at 447 (emphasis omitted). This is because "[a]n employer may be motivated by multiple purposes, both legitimate and illegitimate, when making employment decisions and still be liable." *Id.* To survive summary judgment, the employee needs only to present evidence sufficient to create a genuine issue of material fact whether "discrimination was *a* substantial factor in an adverse employment action, not the only motivating factor." *Id.* at 447 (citing *Mackay*, 127 Wn.2d at 309-11). Mikkelsen has met that showing.

The record, when viewed in the light most favorable to Mikkelsen, shows that she was an exemplary employee for over 27 years. Mikkelsen and Ward worked well together at first, but the relationship quickly soured after Mikkelsen offered constructive criticisms of Ward's management style. Ward started working solely with the other male managers and excluded Mikkelsen from electronic management communications even though she was a manager. Ward appointed the male managers

as acting general manager in his stead whenever he was away from the office even though Mikkelsen had a year of experience running the PUD as interim general manager.

In addition to excluding her from managerial communications, Ward spoke over her during meetings, "denigrated [her] in front of contemporaries and subordinates," CP at 137, called her "untrustworthy," CP at 414, and described her decision to implement new billing software as "real stupid" in front of them, CP at 100. Any time Mikkelsen offered any suggestions during managerial meetings, Ward would flatly dismiss them. To be heard, Mikkelsen had to filter her suggestions through her male contemporaries because Ward would not take suggestions from her. Ward similarly dismissed Mikkelsen's concerns of gender bias. When Mikkelsen suggested the labor contract that they were negotiating should be more gender neutral, Ward dismissed her suggestion and said that he would be willing to wear any uniform supplied by the District "so long as it wasn't 'pink,'" presumably because the color is stereotypically feminine. CP at 318.

Mikkelsen believed Ward ascribed to patriarchal gender roles and preferred that his female subordinates be submissive. According to Mikkelsen, Ward's misogynistic beliefs were obvious given the way he accepted criticism from her male contemporaries but not from her, and how he referred to his female clerical staff as "'girls,' 'gals,' or 'ladies'" but avoided calling his male maintenance crew "'guys' or 'men' or 'boys'"

or other gender specific terms. *Id.* Even the other male managers noticed how Ward treated Mikkelsen differently and described this treatment as a "guy/girl" issue. CP at 115. Additionally, whenever Ward entered Mikkelsen's office, he would "pretty consistent[ly]," CP at 134, "reach into his pockets and rearrange his genitals" before he would sit down, CP at 88. The fact that he did not adjust himself during staff meetings or other times when males were present suggested that this adjustment was a deliberate show of male dominance rather than a gesture of comfort.

The evidence Mikkelsen presented, taken together, demonstrates a genuine dispute of material fact as to whether the breakdown in communication between Mikkelsen and Ward occurred because she is a woman. From this record, a reasonable jury could believe that Ward fired Mikkelsen because she was an assertive woman who challenged his gender stereotypes, or the jury could believe that Ward harbored no gender bias and fired Mikkelsen simply because their personalities and management styles clashed. Either inference is reasonable. Where there are *"reasonable but competing* inferences of *both* discrimination *and* nondiscrimination, 'it is the jury's task to choose between such inferences,'"—not the court's. *Hill*, 144 Wn.2d at 186 (quoting *Carle v. McChord Credit Union*, 65 Wn. App. 93, 102, 827 P.2d 1070 (1992)). We therefore reverse summary judgment dismissal of Mikkelsen's gender discrimination claim.

We affirm summary judgment dismissal of Mikkelsen's age discrimination claim because Mikkelsen presented almost no evidence of age discrimination. Mikkelsen testified that Ward once referred to long term employees as "old and stale" and that Ward had a "fixation" on a 72-year-old employee. CP at 90. But Mikkelsen's testimony suggests that Ward was simply marveling that some employees had worked for the same employer for so long. Mikkelsen presents no evidence that Ward treated older employees differently or that her age played a role in Ward's decision to fire her. The trial court properly concluded that age discrimination was not a substantial factor in Ward's decision to fire Mikkelsen.

E.     Mikkelsen can show a genuine issue of material fact as to whether the corrective action policy modified her at-will employment status

Mikkelsen also argues her discharge violated the district's corrective action policy. The corrective action policy grants the district broad discretion to implement any disciplinary action in any situation. But, when read as a whole, the policy is ambiguous, and whether it constitutes a promise for specific treatment is a question of fact sufficient to survive summary judgment. Therefore, we reverse the trial court's order granting summary judgment on this issue.

The district adopted the corrective action policy in November 2009, while Mikkelsen was the interim general manager. Although the policy grants the district discretion to implement various disciplinary actions, the policy emphasizes that employees should be treated fairly. The policy states as a general principle:

Corrective action should be fair. This means, while the District retains the discretion to determine what action is appropriate in any particular situation, the corrective action should be equal with the misconduct or performance deficiency at issue, and whenever possible, performance issues typically should be addressed, at least initially, with an eye to improvement.

CP at 343. The policy also considers "Employee Rights":

Corrective action must be administered with due consideration of, and respect for, employee rights and expectations, whether those rights and expectations derive from employment policies, operation of law, or contract. . . .

. . . .

Supervisors will not fail first to review disciplinary actions on difficult issues with the General Manager, particularly when especially severe corrective action, such as suspension and/or discharge, is under consideration.

CP at 344. Under "Reasons for Corrective Action," the policy provides:

Violations of the District's standards of conduct and/or the failure or refusal to meet work performance requirements are unacceptable and may result in corrective action. The acceptability of certain conduct often turns on the specific facts and circumstances involved. No organization can accurately anticipate and list every type of conduct or work performance that is unacceptable. The District does not try to do so here. Instead, the District provides some examples, which are intended to illustrate broadly, without limiting, the types of conduct and work performance it may consider unacceptable, and to what degree. These are only guidelines. To be able to respond appropriately to whatever particular circumstances may arise in the future, the District must, reserve the right to determine the categorization of, and response to, any conduct or performance concern, regardless of where it falls within the broad parameters set forth below.

*Id.*

The policy lists three categories of offenses: minor, intermediate, and major. For major offenses, the policy provides that "[m]ajor offenses and performance-related concerns are actions typically considered severe enough to call for prompt and severe corrective action up to and including immediate discharge without prior warning or counseling." CP at 345. The nonexclusive list of examples for major offenses includes repetition of an intermediate offense, unauthorized use or release of confidential information, insubordination or refusal to carry out instructions, misusing or damaging district property, falsifying records, unlawful harassment or discrimination, abusive or violent conduct, violating the alcohol policy, unauthorized possession of firearms, and failure to follow safety and security procedures. Following this list, the policy provides:

> This policy is not intended to be a complete list of all circumstances that may result in corrective action or discharge. The rules set out here are intended only as guidelines, and do not give any employee a right to continued employment or any particular level of corrective action.

CP at 346.

The policy then provides goals for implementing corrective action:

> The general goal of the District's corrective action policy is to correct unsatisfactory behavior or performance. To that end, where appropriate in its judgment, the District will apply less severe corrective action initially, and more severe measures if the problem persists. However, this is only a guideline. The District does not promise employees a specific formula of corrective action will be followed in every instance. Different circumstances warrant different responses. Unless otherwise prohibited by law, when the District concludes an employee has not adhered to its standards or performance otherwise is unsatisfactory, the District may

take the corrective action it decides is appropriate under the circumstances, which may involve any one or combination of the steps identified below, up to and including immediate discharge without prior corrective action or notice.

*Id.*

Finally, the policy provides definitions and procedures for implementing specific corrective actions in order of severity: verbal warning, written warning, probation, suspension, and discharge. For discharge, the policy provides:

> This is generally used in cases of major offenses, repeated or uncorrected minor or intermediate offenses after at least one written warning, continued performance deficiencies (previously identified in a written warning), or unacceptable responses to corrective action taken by the employee. In general, discharges are to be reviewed by the General Manager before being communicated to the employee. In some cases, however, this may not occur. If an employee is discharged before the decision is reviewed by the General Manager, the discharge will still be effective immediately but the District may, at its discretion, reverse the discharge after it is reviewed. The discharge decision should be documented by the employee's direct supervisor in a memorandum, which identifies the reason(s) for the termination, the previous attempts to correct the situation, if any, and the terms of the termination. The termination letter must be placed in the employee's personnel file.

CP at 347.

Generally, an employment contract indefinite in duration is terminable at will. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 223, 685 P.2d 1081 (1984). But, under certain circumstances, "employers may be obligated to act in accordance with policies as announced in handbooks issued to their employees." *Id.* at 229. For example, if the employer has made promises of specific treatment in specific situations

on which the employee justifiably relies, those promises are enforceable and may modify an employee's at-will status. *Id.* at 230. Under this theory, Mikkelsen must show "(1) that a statement (or statements) in an employee manual or handbook or similar document amounts to a promise of specific treatment in specific situations, (2) that the employee justifiably relied on the promise, and (3) that the promise was breached." *Korslund v. DynCorp Tri-Cities Servs., Inc.*, 156 Wn.2d 168, 184-85, 125 P.3d 119 (2005), *overruled on other grounds by Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 358 P.3d 1139 (2015). "[T]he crucial question is whether the employee has a reasonable expectation the employer will follow the discipline procedure, based upon the language used in stating the procedure and the pattern of practice in the workplace." *Payne v. Sunnyside Cmty. Hosp.*, 78 Wn. App. 34, 42, 894 P.2d 1379 (1995). "[W]hether an employment policy manual issued by an employer contains a promise of specific treatment in specific situations, whether the employee justifiably relied on the promise, and whether the promise was breached are questions of *fact.*" *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 104-05, 864 P.2d 937 (1994). Therefore, summary judgment is proper only if reasonable minds could not differ in resolving these questions. *Id.* at 105.

The corrective action policy here contains many provisions suggesting the district has broad discretion in implementing disciplinary procedures. But these provisions are at odds with other parts of the policy that seem to promise fair treatment

and arguably establish a for-cause requirement for discharge. Therefore, the policy is ambiguous and could plausibly be read as modifying Mikkelsen's at-will status. Because the question of whether the policy constitutes a promise for specific treatment is a question of fact, and because the summary judgment standard requires that we view all factual inferences in the light most favorable to Mikkelsen, we think the ambiguity in the policy creates a genuine issue of material fact sufficient to survive summary judgment.

The district contends the policy contains a disclaimer negating any inference that the policy constitutes a promise for specific treatment in disciplinary proceedings. Specifically, the policy provides that "[t]he rules set out here are intended only as guidelines, and do not give any employee a right to continued employment or any particular level of corrective action." CP at 346. Relying on *Kuest*, the Court of Appeals held this provision prevented the policy from modifying Mikkelsen's at-will status. But the disclaimer in *Kuest* was far more explicit than the alleged disclaimer here:

> "I further understand that neither the policies and procedures of the Community, as described in the Handbook or as may otherwise exist, nor the Handbook, nor any custom or practice of the Community are intended to be nor *do constitute a contractual arrangement* or agreement between the Community and myself of any kind including but not limited to duration of my employment with the Community. *I understand that my employment is 'at will' and may be terminated, with or without cause*, by me or by the Community, at any time and that no employee of the Community is authorized to make nor may I rely upon any oral or written

assurance of continued employment made to me, other than in writing, but the President of Regent Assisted Living."

111 Wn. App. at 49 (emphasis added). The alleged disclaimer here is much more ambiguous. One could reasonably read the provision as stating that the district may, within its discretion, apply any corrective action in a given situation, up to and including discharge. But the provision does not suggest that corrective action may be arbitrary, nor does it emphasize that employees subject to the policy remain at will.

In addition to the alleged disclaimer, the policy repeatedly emphasizes the district's discretion in determining corrective outcomes. *See, e.g.*, CP at 346 ("[T]he District may take the corrective action it decides is appropriate under the circumstances, which may involve any one or combination of the steps identified below, up to and including immediate discharge without prior corrective action or notice."). Indeed, rather than promising "specific treatment in specific situations," *Thompson*, 102 Wn.2d at 230 (emphasis omitted), one provision seems to state the exact opposite: "The District does not promise employees a specific formula of corrective action will be followed in every instance." CP at 346; *see also Thompson*, 102 Wn.2d at 231 ("[P]olicy statements as written may not amount to promises of specific treatment and merely be general statements of company policy and, thus, not binding. Moreover, the employer may . . . write them in a manner that retains discretion to the employer.").

But despite this discretionary language, other provisions suggest the district promised to refrain from arbitrary corrective action. Taken as a whole, the policy could plausibly be read as requiring fair treatment during disciplinary proceedings and establishing a for-cause requirement for discharge. For example, although the provisions above suggest the district has broad discretion in taking any number of corrective actions, they do not state that the district may impose corrective action without cause. As a whole, the policy seems to suggest the opposite. Near the beginning of the policy, under "Employee Rights," the policy provides that "Corrective action *must* be administered with due consideration of, and respect for, employee rights and expectations, whether those rights and expectations derive from employment policies, operation of law, or contract." CP at 344 (emphasis added). This compulsory language indicates an obligation on the employer. *See Stewart v. Chevron Chem. Co.*, 111 Wn.2d 609, 613-14, 762 P.2d 1143 (1988) (discussing whether statements in an employment policy were mandatory or discretionary). Discharge is included in the policy's list of the different forms of corrective action. Therefore, taken together with the "Employee Rights" section at the beginning of the policy, the policy indicates that discharge may occur only "with due consideration of, and respect for, employee rights and expectations, whether those rights and expectations derive from employment policies, operation of law, or contract." CP at 344.

The section describing the circumstances for discharge could establish an expectation that employees may not be fired without cause. Discharge is permitted "in cases of major offenses, repeated or uncorrected minor or intermediate offenses after at least one written warning, continued performance deficiencies (previously identified in a written warning), or unacceptable responses to corrective action by the employee." CP at 347. Employees are entitled to union representation during any meeting related to disciplinary action. Supervisors must review disciplinary action with the general manager, "particularly when especially severe corrective action, such as suspension and/or discharge, is under consideration." CP at 344. Discharge decisions "should be documented by the employee's direct supervisor in a memorandum, which identifies the reason(s) for the termination, the previous attempts to correct the situation, if any, and the terms of the termination." CP at 347. Discharge may be subject to review by the Board.

These provisions suggest that dismissal may not occur arbitrarily or without cause. Combined with the policy's statement that corrective action "must" be administered fairly and in light of employee's reasonable expectations, the policy could plausibly be read as constituting a promise for specific treatment that modifies Mikkelsen's at-will employment status.

The Court of Appeals has held that ambiguous discipline policies create an issue of fact as to whether the employer made a binding promise to follow certain discipline

procedures. *See Payne*, 78 Wn. App. at 42 (summary judgment was improper when disclaimer permitting discharge "'without notice, for any reason or no reason'" was inconsistent with the employer's "choice of terms" in other parts of the discipline policy); *Wlasiuk v. Whirlpool Corp.*, 81 Wn. App. 163, 172, 914 P.2d 102 (1996) ("The statement 'nothing contained herein shall be deemed . . . to confer or modify any specific employee benefit' is ambiguous in a paragraph which also states that the booklet is only a 'general outline' and that 'additional benefits and policies may apply.'" (alteration in original)). Further, the presence of discretionary language may not be sufficient for summary judgment when other representations negate that language. *See, e.g., Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 532, 826 P.2d 664 (1992) ("We reject the premise that this disclaimer can, as a matter of law, effectively serve as an eternal escape hatch for an employer who may then make whatever unenforceable promises of working conditions it is to its benefit to make."). Likewise, the policy here is ambiguous because the discretionary language is inconsistent with other provisions in the policy that suggest employees may not be discharged without cause. Therefore, whether the policy, the history of its usage, or any other representations from the district constitute a promise for specific treatment is a question of fact sufficient to survive summary judgment.

Finally, Ward contends that the court should nevertheless affirm dismissal of Mikkelsen's claims as they relate to him. He claims that he was not a party to the

implied contract created by the corrective action policy and that he is immune under several statutory provisions. *See* RCW 4.24.470; RCW 54.12.110. We decline to address these issues because neither the trial court nor the Court of Appeals reached them. Ward will have an opportunity to raise these issues on remand.

## IV.  CONCLUSION

We affirm summary judgment dismissal of Mikkelsen's age discrimination claim because she presented almost no evidence of age discrimination.  However, we reverse summary judgment dismissal of Mikkelsen's gender discrimination claim because Mikkelsen presented evidence that, taken together, provides a reasonable basis for a jury to find that Ward fired her because she was an assertive woman who did not conform to patriarchal stereotypes.  Because the corrective action policy could plausibly be read as establishing a for-cause standard for dismissal, we reverse and remand to the trial court to determine whether the policy and any other representations amounted to a promise for specific treatment in disciplinary proceedings.

Fairhurst, C.J.

WE CONCUR:

_____
Johnson, J.

_____
Madsen, J.

_____
Owens, J.

_____
Stephens, J.

_____
Wiggins, J.

_____
González, J.

_____
Gerry McCloud, J.

_____
Yu, J.